FILED
SUPERIOR COURT
OF GUAM

2018 FEB -2 AM 11: 55

CLERK OF COURT

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| DFS GUAM L.P., <br><br> Plaintiff, <br><br> v. <br><br> THE A.B. WON PAT INTERNATIONAL AIRPORT AUTHORITY, GUAM, AND DOE DEFENDANTS 1-10, INCLUSIVE, <br><br> Defendant. | CIVIL CASE NO. CV 0943-14 <br> (Consolidated with <br> CV 0094-15 and CV 0198-15) <br><br><br> **DECISION AND ORDER ON DEFENDANT ANTONIO B. WON PAT INTERNATIONAL AIRPORT AUTHORITY, GUAM'S MOTION FOR SUMMARY JUDGMENT NO. 2 (SECOND PROTEST)** |

## INTRODUCTION

This matter came before the Honorable Arthur R. Barcinas on November 28 and November 29, 2017, upon Defendant Antonio B. Won Pat International Airport Authority, Guam's Motion for Summary Judgment No. 2 (Second Protest). Plaintiff DFS Guam L.P. ("DFS") was represented by Attorneys Maurice Suh, Jay Srinivasan, and Daniel Weiss. Attorneys Jay D. Trickett, Genevieve P. Rapadas, and Sarah Fabian represented Defendant A.B. Won Pat International Airport Authority, Guam ("AIAA").

AIAA's Motion for Summary Judgment No. 2 (Second Protest) is the second of three motions for summary judgment filed by AIAA, and the first of four motions for summary judgment heard by the Court. AIAA's Motion for Summary Judgment No. 2 (Second Protest) is

directed at all the causes of action set forth in DFS' second complaint filed on October 14, 2014 (Complaint No. 2). In their Motion, AIAA requests that the Court grant summary judgment in its favor on the grounds that: 1) DFS' claims regarding the automatic stay provision fail as a matter of law; 2) DFS' claims regarding "Additional Benefits" fail because it was permitted by the Procurement and DFS' Protest concerning those "Additional Benefits" was untimely; and 3) DFS' claims that Lotte made untimely modifications to its proposal fail because Lotte did not modify its proposal and even if Lotte did modify its proposal, the Procurement does not mandate an automatic disqualification for untimely modifications. DFS counters that AIAA's arguments are either meritless as a matter of law or that they depend upon issues over which there is a genuine dispute of the material facts. For the reasons set forth below, the Court DENIES AIAA's Motion to for Summary Judgment No. 2 (Second Protest).

## BACKGROUND

This case arises from a procurement dispute between DFS and AIAA. On July 19, 2012, AIAA issued RFP No. GIAA010-FY12 ("Procurement") for the specialty retail concession at the Airport. Ada Decl. (MSJ 2), ¶ 3. The purpose of the Procurement was "to develop, construct, and operate a high quality specialty retail concession at the GIAA Main Passenger Terminal." Rapadas Decl. Ex. 23, at GIAAPR 100012. The proposals in response to the Procurement were due no later than October 17, 2012. Ada Decl. (MSJ 2), ¶ 4. The Procurement also required any proposal modifications be made before the submission deadline and that late proposals would automatically be disqualified. Rapadas Decl. Ex. 23, at GIAAPR 100012, GIAAPR 100028. DFS, Lotte Duty Free Guam, LLC ("Lotte"), and two other proposers timely submitted their proposals by submission deadline. Ada Decl. (MSJ 2), ¶ 4.

On October 17, 2012, Lotte submitted a proposal in response to the Procurement. Id. In its proposal, Lotte offered, among other items, the following:

    i.     For the Main Concession Space, a MAG Rent of $13 million per year and a Percentage Rental Rate of 30.1%. Ada Decl. (MSJ 2), Ex 24, at 13, 389;

    ii.    For the proposed Additional Space, a MAG Rent of $240,000 and a Percentage Rent Rate of 25.0%. Id. at 389;

    iii.    Improvements to areas outside of the Main Concession Space and proposed Additional Space including renovations to the food court, bathrooms, and smoking lounge, and the construction of a children's play area and Internet stations. Id. at 10, 230, 232-235;

    iv.    For a potential Downtown Lotte Duty Free Store, Lotte would "potentially look" into building a downtown store in which a percentage of all downtown duty free revenues would be paid to the Airport. Id. at 405; and

    v.    For the potential Construction of a Third Floor, subject to a successful bid, Lotte "would be more than happy to enter into discussions with the GIAA about how it could provide assistance with funding" the construction of an additional floor at the Airport. Id. at 406.

References to the downtown duty free store and the development of an additional floor at the airport were included in the "Other Information" section of Lotte's proposal in response to the Procurement, which requested for "any other information that [a proposer] believes would be helpful in evaluating its proposal and the Proposer's ability to successfully develop and operate the concession. Id. at 405-06; see also Rapadas Decl. Ex. 23, at GIAAPR 100049.

On November 28, 29, and December 5, 2012, the Evaluation Committee for the RFP conducted an interview with each of the four proposers, the purpose of which was "to clarify and/or explain parts of the proposal."[1] Rapadas Decl. Ex. 23, at GIAAPR 100030; see also Rapadas Decl. Ex. 26, at GIAAPR 103609.

In its November 29, 2012, interview, Lotte included in its presentation materials that its proposed MAG Rent for the Main Concession Space was $13 million with a Percentage Rent Rate of 30.1%, and that its proposed MAG Rent for the Additional Space was $240,000 with a Percentage Rent Rate of 25.0%. Rapadas Decl. Ex. 26, at GIAAPR 103770. However, Lotte also specified at the end of its presentation that its proposed MAG Rent for the Main

---

[1] On November 1, 2012, the following individuals were appointed to the Evaluation Committee: Pedro R. Martinez (Deputy Executive Manager), Jean M. Arriola (Airport Services Manager), Carlos Bordallo (Comptroller), and Frank Santos (Business and Financial Consultant). Ada Decl. (MSJ 2), ¶ 8.

Concession Space was $15.4 million with a Percentage Rent Rate of 33.0%, while its proposed MAG Rent and Percentage Rent Rate for the Additional Space remained the same. Id. at GIAAPR 103798. These numbers were labeled in Lotte's presentation materials as "The Updated Concession Revenue Picture" and "Average over 10-year concession – UPDATED FROM INITIAL SUBMISSION." Id.

Also during its interview, Lotte discussed its plans to refurbish the food court and restrooms, as well as its plans to construct a play area for children, a smoking lounge, and Internet stations. Id. at GIAAPR 103740, GIAAPR 103773-77. In addition, Lotte expounded on its plans to open up a Downtown Duty Free Store, stating in its materials that Lotte "will open a downtown duty free store in Guam" and that "[s]ubject to negotiation, [a percentage] of downtown sales . . . will be paid to GIAA as a marketing fee" with a minimum fee of $2 million. Id. at GIAAPR 103787. Lastly, Lotte indicated in its proposal materials that it was willing to invest approximately $32 million, subject to negotiation, to fund the construction of an additional floor at the Airport. Id. at GIAAPR 103791.

On January 2013, AIAA engaged Leigh|Fisher, its independent financial consultant, to review and compare the financial components of each proposal. Rapadas Decl. Ex. 28; Ada Decl. (MSJ 2), ¶ 8. Leigh|Fisher informed AIAA that additional clarification was needed to complete the comparisons, and on February 26, 2013, AIAA requested additional clarification from Lotte regarding the financial components of its proposal. Rapadas Decl. Ex. 31. In a letter to Lotte seeking clarification, AIAA Executive Manager, Charles Ada, noted that Lotte's initial proposal included a MAG Rent of $13 million, yet Lotte's presentation materials during its November 29, 2012, interview included a proposed MAG Rent of $15.4 million over the course of ten (10) years. Id. Mr. Ada proceeded to ask SK Lee, Chairman of Lotte, "[i]s your proposaed MAG rent still $13 million as indicated in your original proposal, or has it changed to $15.4 million as indicated in your presentation booklet?" Id. AIAA did not inquire about Lotte's increased Percentage Rent Rate of 33.0% presented at the interview. See id. On February 28, 2013, Lotte responded stating that its proposed MAG remained at $13 million as noted in its original proposal and characterized its $15.4 million MAG as "a clarification, and

not a modification of [its original] Bid." Rapadas Decl. Ex. 32. Lotte also did not clarify the 33.0% Percentage Rent Rate presented at its interview. See id. On March 13, 2013, AIAA sent another letter to Lotte seeking clarification regarding its MAG Rent for the proposed Additional Space and its MAG Rent value over a ten (10) year period. Rapadas Decl. Ex. 33. In response, Lotte stated that its MAG Rent for the Main Concession Space was $13 million per year and that its MAG for the proposed Additional Space was $240,000 per year. Rapadas Decl. Ex. 34, at GIAAPR 200507. Also in its response, Lotte provided a chart projecting its MAG Rent for ten (10) years, including revenue forecasts from the potential Third Floor and Lotte's Downtown Duty Free Store, totaling a proposed MAG Rent over a 10-year concession contract of $15.36 million. Id. at GIAAPR 200508.

On March 25 through March 27, 2013, after receiving the Leigh|Fisher final report, the Evaluation Committee scored each of the four proposals based on the evaluation criteria set forth in the Procurement and submitted their evaluation score sheets for tabulation. Rapadas Decl. Ex. 35; see also Rapadas Decl. Exs. 36-39.

On April 12, 2013, the Board held a special meeting in which the Board, using a random letter designation process, approved the Evaluation Committee's recommendation of "Proposer A" as the highest ranked proposer. The Board approved the award to "Proposer A," which was announced as Lotte, subject to successful negotiations of the Specialty Retail Concession Agreement. AIAA and Lotte commenced negotiations on April 17, 2013. Rapadas Decl. Ex. 40.

On April 23, 2013, AIAA sent a copy of the revised Specialty Retail Concession Agreement for Lotte's review, which included a MAG Rent of $13 million. Rapadas Decl. Ex. 41, at GIAAPR 104187. That same day, DFS submitted its first procurement protest challenging the Procurement and the ranking of Lotte as the most qualified proposer (First Protest). DFS demanded that AIAA management stay its negotiations with Lotte pursuant to 5 GCA § 5425(g), and AIAA management and Lotte temporarily stopped their negotiations for the concession agreement.

On May 17, 2013, AIAA denied DFS' First Protest based on the determination that the protest was filed past the statutory deadline and therefore, could not be considered. On May 18,

2013, AIAA management and Lotte resumed contract negotiations for the concession agreement. That same day, AIAA sent another revision of the Specialty Retail Concession agreement, which maintained a MAG Rent of $13 million. Rapadas Decl. Ex. 42, at GIAAPR 104187.

On May 18, 2013, AIAA entered into the Specialty Retail Concession Agreement with Lotte. Rapadas Decl. Ex. 43 at GIAAPR 104256, GIAAPR 104324. The final contract included a MAG Rent over $15 million as well as an agreement that Lotte would refurbish the food court and restrooms, and that Lotte would construct a children's play area and smoking lounge. Id. at GIAAPR 104288, GIAAPR 104276. On May 20, 2013, AIAA issued a press release announcing that the Specialty Retail Concession Agreement with Lotte had been signed. Ada Decl. (MSJ 2), Ex. L at 2. On June 11, 2013, the AIAA Board ratified the agreement entered into by AIAA management and Lotte, as well as all other actions regarding the Procurement. On July 21, 2013, Lotte moved in to the airport main concession space.

On May 29, 2013, DFS submitted its second procurement protest challenging AIAA's award of the Procurement to Lotte (Second Protest). Ada Decl. (MSJ 2), Ex. L at 2-3. Specifically, DFS' Second Protest alleged that Lotte had offered and AIAA had accepted non-retail benefits not requested by the Procurement. Id. On June 7, 2013, after receiving a copy of Lotte's proposal and presentation materials, DFS supplemented its protest to include allegations that Lotte made untimely modifications to its original proposal, namely, by increasing its MAG Rent offer from $13 million to $15.4 million and its Percentage Rent Rate offer from 30.1% to 33.0%. Id. at 5. In addition, DFS alleged in its supplement to its Second Protest that Lotte made untimely modifications to its proposal by offering to pay AIAA a marketing fee, with a minimum fee of $2 million, from revenues of produces at its Downtown Duty Free Store, as well as by offering to fund the construction of an additional floor at the Airport. Id. at 6.

On May 30, 2013, while DFS' Second Protest was pending, DFS filed a civil action, in Civil Case No. CV 0685-13, challenging AIAA's award of the specialty retail contract to Lotte based on the reasons set forth in DFS' First Protest. On July 2, 2013, DFS filed an amended complaint to include the allegations giving rise to all three protests. This action was dismissed

for failure to exhaust administrative remedies on July 21, 2013. <u>DFS Guam L.P. v. A.B. Won Pat Int'l. Airport Auth.</u>, 2014 Guam 12. On October 14, 2014, DFS filed another lawsuit against AIAA and Lotte for the wrongful award of the duty-free concession contract under Superior Court Civil Case No. CV0943-14. The Court consolidated Superior Court Civil Case Nos. CV0094-15, CV0198-15, and CV0943-14, on July 19, 2016.

While the civil action in CV 0685-13 was pending, AIAA stayed its investigation of DFS' Second Protest. After those proceedings were completed, AIAA issued a letter denying AIAA Second Protest on January 13, 2015. Ada Decl. (MSJ 2), Ex. O at GIAAPR 300386-99.

On April 13, 2017, AIAA filed its Motion for Summary Judgment No. 2 (Second Protest) ("MSJ 2"). Plaintiff, DFS filed their opposition on October 6, 2017, and AIAA filed their reply on October 27, 2017. This is the second of three (3) Motions for Summary Judgment filed by AIAA[2]. The Court heard oral arguments from both parties on AIAA's Motion for Summary Judgement No. 2 (Second Protest) on November 28 and November 29, 2017. The Court then took this matter under advisement.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Guam R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). Rule 56(c) of the GRCP further mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U .5. at 322. A genuine issue of material fact exists if there is sufficient evidence which establishes a factual dispute requiring resolution by a fact-finder. <u>Guam Pac Enter., Inc. v. Guam Poresia Corp. et al.</u>, 2007 Guam 22 n.8 (citing <u>Iizuka Corp. v. Kawasho Int'l (Guam). Inc.</u>, 1997 Guam 10 ¶ 7). The factual dispute must also concern

---

[2] AIAA filed three Motions for Summary Judgment with the Court. Motion for Summary Judgment No. 1 (First Protest) was filed on April 13, 2017, and argued on November 27, 2017. Motion for Summary Judgment No. 2 (Second Protest) was filed on April 13 2017, and heard over November 28-29, 2017. Motion for Summary Judgment No. 3 (Third Protest) was filed on April 13, 2017, and heard on November 30, 2017.

a fact "that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." Id.

If the movant demonstrates a lack of a genuine issue of material fact, "the non-movant cannot merely rely on allegations contained in the complaint, but must produce at least some significant probative evidence tending to support the complaint." Edwards v. Pacific Fin. Corp. et al., 2000 Guam 27 n. 7 (citations omitted). Thus, the ultimate inquiry for the Court is "whether the 'specific fact' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." Bank of Guam v. Flores, 2004 Guam 25 n.7. In determining a motion for summary judgment, "the court must draw inferences and view the evidence in a light most favorable to the non-moving party." Id.

AIAA directs its Motion for Summary Judgment No. 2 (Second Protest) at all the causes of action set forth in DFS' second complaint filed on October 14, 2014 (Complaint No. 2). In their Motion, AIAA requests that the Court grant summary judgment in its favor on the grounds that: 1) DFS' claims regarding the automatic stay provision fail as a matter of law; 2) DFS' claims regarding "Additional Benefits" fail because it was permitted by the Procurement and DFS' Protest concerning those "Additional Benefits" was untimely; and 3) DFS' claims that Lotte made untimely modifications to its proposal fail because Lotte did not modify its proposal and even if Lotte did modify its proposal, the Procurement does not mandate an automatic disqualification for untimely modifications. On the other hand, DFS argues that AIAA's arguments are either meritless as a matter of law or that they depend upon issues over which there is a genuine dispute of the material facts.

## I. The Court Finds That DFS' Second Protest Was Made Pre-Award and That AIAA Violated the Automatic Stay Provision mandated by 5 GCA § 5425(g).

Guam's Procurement Law states that "[i]n the event of a timely protest under Subsection (a) of this Section or under Subsection (a) of § 5480 of this Chapter, the Territory shall not proceed further with the solicitation or with the award of the contract prior to final resolution of such protest, and any such further action is void . . . ." 5 GCA § 5425(g); see also 9 GAR §

9101(e). In <u>Guam Imaging Consultants, Inc.</u>, the Supreme Court made clear the timeliness requirement of the automatic stay provision, stating that "the Guam Procurement Law . . . contain[s] automatic stay provisions that are triggered by timely protests," and that "a protest . . . be both factually timely and pursued before the award has been made in order to trigger the automatic stay [provision]." <u>Guam Imaging Consultants, Inc. v. Guam Mem. Hosp. Auth.</u>, 2004 Guam 15 ¶ 23. In other words, AIAA would have violated the automatic stay provision mandated by 5 GCA § 5425(g) if DFS' protest was both factually timely and filed before the award to Lotte was made. <u>See</u> <u>Id.</u> Further, the Supreme Court has also clarified the finality requirement under 5 GCA § 5425(g), holding that the automatic stay provision remains in effect during "commencement of a civil suit within the Superior Court and continues until *final resolution* of the action by the Superior Court." <u>Teleguam Holdings, LLC v. Territory of Guam</u>, 2015 Guam 13 ¶ 31 (emphasis added).

AIAA argues that it is entitled to summary judgment as to DFS' First (1st) and Second (2nd) Causes of Action alleging that AIAA violated the automatic stay provisions of the Procurement Law by not staying the procurement process upon receiving DFS' Second Protest on May 29, 2013. Specifically, AIAA maintains that because AIAA management entered into a Specialty Retail Concession Agreement with Lotte on May 18, 2013, DFS' Second Protest was made post award and therefore, the automatic stay provision mandated by 5 GCA § 5425(g) did not apply. DFS, on the other hand, argues that the May 18, 2013, agreement between AIAA management and Lotte was not an award of the Procurement because it had not been approved and executed by the AIAA Board of Directors. DFS contends that the Procurement contract was not awarded on May 18, 2013, because AIAA's Executive Manager, Charles Ada, lacked the authority by the Board to execute the agreement, and that the award was effectuated only upon ratification by AIAA's Board of Directors on June 11, 2013. <u>See</u> 12 GCA § 1107(b)(7); <u>see also</u> 2 GAR, Div. 4 §§ 3144(l)(1), (3). Hence, because DFS submitted its Second Protest before the Board ratification and before the award of the concession contract to Lotte, DFS argues that AIAA's failure to stay its proceedings and continuing with the Procurement contract was in

violation of the automatic stay provisions mandated by Guam's Procurement Law. See 5 GCA § 5425(g).

The parties agree on several undisputed events. The parties agree that AIAA revealed Lotte as the most qualified bidder during AIAA's Board meeting held on April 12, 2013. Secondly, the parties agree that DFS filed its First Protest on April 23, 2013. AIAA investigated DFS' First Protest and issued a written denial of the First Protest on May 17, 2017. AIAA and Lotte concluded their negotiations for a concession contract the following day on May 18, 2013, and publically announced the conclusion of the negotiations in a memorandum issued on May 20, 2013. The parties also agree that on May 29, 2013, DFS filed its Second Protest with AIAA, and that on May 30, 2013, DFS filed a civil action with the Superior Court of Guam and procurement appeal with the OPA. Lastly, the parties agree that the Board approved all of AIAA's Procurement-related activities during a special Board meeting held on June 11, 2013.

The Court adopts the findings of the Court's Decision and Order for AIAA's Motion for Summary Judgment No. 1 (First Protest) (MSJ 1), and finds that DFS timely submitted its First Protest on April 23, 2013, which triggered the Procurement Code's automatic stay provision. See DFS Guam, L.P., v. The A.B. Won Pat Int'l Airport Auth., Guam, and Doe Defendants 1-10, Inclusive, Civil Case No. 0943-14, *Decision and Order on Defendant Antonio B. Won Pat International Airport Authority, Guam's Motion for Summary Judgment No. 1 (First Protest)*. The Court also found that because this instant matter is ongoing before the Court and the dispute underlying DFS' First Protest remains unresolved, the automatic stay requirement prompted by DFS' First Protest remains in effect to this date. Mindful of these findings, the Court examines the facts presented by the parties for this motion.

DFS timely filed its First Protest on April 23, 2013. Although the parties disagree on when AIAA awarded the contract to Lotte, the parties agree that no award was made prior to April 23, 2013. DFS' timely filing of its First Protest prior to the award to Lotte triggered an automatic stay pursuant to 5 GCA § 5425(g). The automatic stay required the Territory to "not proceed further with the award or with the award of the contract prior to final resolution of such protest, and any such further action is void..." 5 GCA § 5425(g). On Friday, May 17, 2013,

AIAA denied DFS' First Protest. DFS then simultaneously filed a civil action with the Superior Court and an appeal with the OPA on May 30, 2013. By filing an appeal to the OPA within the statutorily allotted fifteen (15) days, DFS preserved its rights to an appeal to the OPA. See 5 GCA 5425(e). The automatic stay triggered by DFS' First Protest remains in effect today because the First Protest has not reached a final resolution.

Under Teleguam, AIAA should have refrained from taking any action until after the fifteen-day appeal period elapsed, after having made sure DFS did not file an appeal to the OPA. Teleguam, 2015 Guam 3 ¶ 31. However, AIAA concluded for itself that the agency's denial gave finality to the First Protest. Notwithstanding its duty to remain stayed, AIAA resumed its negotiations with Lotte on Saturday, May 18, 2013, and on the same day, reached an agreement. AIAA's actions appear to have frustrated the due process rights of DFS. Thus, the Court finds those negotiations as well as any other procurement-related activities undertaken by AIAA following DFS' First Protest filed on April 23, 2013, violated the automatic stay provision mandated by Guam's Procurement Law. See 5 GCA § 5425(g).

Again, AIAA argues that the agency awarded the Specialty Retail Concession Agreement to Lotte when the two parties reached an agreement on May 18, 2013. DFS argues that AIAA awarded Lotte the contract at the June 11, 2013, Board meeting. Regardless of when the purported award to Lotte occurred, AIAA did so during the pendency of the First Protest's automatic stay, in violation of 5 GCA § 5425(g). Therefore, the Court finds that DFS filed its Second Protest during the pre-award phase of the Procurement. Because the Court finds that DFS' Second Protest was made pre-award, the Court DENIES AIAA's Motion for Summary Judgment as to those Causes of Action in Complaint No. 2 insofar as they are based on DFS' automatic stay claims regarding DFS' Second Protest, and DECLARES that AIAA violated 5 GCA § 5425(g).

## II.   A Material Issue of Fact Exists as to Whether Those "Additional Benefits" Included in Lotte Proposal and Considered by AIAA were permitted by the Procurement.

Interpretation of a government or public solicitation begins with the plain language of the document. See Banknote Corp. of America, Inc. v. U.S., 365 F.3d 1345, 1353 (2004); see

also <u>CliniComp Int'l, Inc. v. United States</u>, 177 Fed.Cl. 722, 736 (2014). If the provisions of the solicitation are open to more than one interpretation, then the solicitation is ambiguous. <u>Banknote</u>, 365 F.3d at 1353 (citations omitted). In determining the solicitation's plain meaning, the Court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." <u>Id.</u> If the terms of the solicitation are clear and unambiguous, then they must be given their plain meaning and extrinsic evidence cannot be used for its interpretation. <u>Id.</u>

AIAA argues that it is entitled to summary judgment as to DFS' Third (3rd), Fourth (4th), and Fifth (5th) Causes of Action based exclusively on allegations regarding improper "additional benefits" offered by Lotte and considered by AIAA, as well as DFS' Eighth (8th) and Ninth (9th) Causes of Actions based in part on those allegations, because "additional benefits" were permitted by the Procurement and the Guam's Procurement Law. Specifically, AIAA argues that the subject of the Procurement was not solely limited to the Main Concession Space, that the "additional benefits" were not prohibited by the Procurement or Guam's Procurement Law, and that AIAA evaluated the proposals solely on the basis of the evaluation factors set forth in the Procurement. DFS, on the other hand, argues that AIAA's arguments require the Court to rely on disputed facts, that AIAA's arguments are contrary to law, and that genuine issues of material fact exists as to the timeliness of DFS' Second Protest. Thus, DFS maintains that Lotte had offered and AIAA had accepted improper benefits in violation of the Procurement and Guam's Procurement Law.

First, the parties do not dispute that Lotte's proposal included "additional benefits" outside the scope of the Main Concession Space. What is at dispute is whether those "additional benefits" were permitted by the Procurement Law and the terms of the Procurement, and whether AIAA was permitted to consider those "additional benefits" in their evaluation of the proposals. Specifically, AIAA argues that the Procurement's objective was to "expand GIAA's existing retail concession program with world-class amenities for the traveling public." Mot. at 11; Rapadas Decl., Ex. 23 at GIAAPR 10012. Therefore, AIAA maintains that the subject of the Procurement was broader than the retail space, and because nowhere in the Procurement does it

expressly limit offers to the designated retail space, "proposers had wide latitude to submit proposals that would enhance the Airport beyond the existing retail space and the minimum requirements of the [Procurement]." Mot. at 11. DFS, on the other hand, argues that the Procurement was not "open ended" and did not allow proposers to include "additional benefits" unrelated to the Main Concession Space. To resolve this dispute, the Court begins by looking at the terms of the Procurement. The relevant provisions are as follows.

The Procurement issued by AIAA for the Specialty Retail Concession invited proposers to submit competitive proposals "to develop, construct, and operate a high quality specialty retail concession at the GIAA Main Passenger Terminal." Rapadas Decl., Ex. 23 at GIAAPR 10012. The purpose of which was "to expand GIAA's existing retail concession program with world-class amenities for the traveling public." Id. In addition, the Procurement sought proposals "for multiple concepts within a single location . . . ." Id. Further, the "Background and Purpose" section of the Procurement provided that "GIAA is seeking a qualified concessionaire to provide for the sale of high quality, branded merchandise products, using exciting, innovative marketing and merchandising techniques that will appeal to the traveling public, along with culturally and aesthetically pleasing facility designs that will enhance the terminal environment. Id. at GIAAPR 100035. Lastly, the Procurement also allowed proposers to "propose additional locations within the Main Terminal Building for the operation [of] the Proposer's concession ('Additional Space')." Id. at GIAAPR 100036.

The Procurement defined the premises of the Main Passenger Terminal reserved for the specialty retail concession (Main Concession Space). The Procurement offered: 1) a specialty retail concession area located at the "Concourse Level;" 2) an optional storage space, an employee lounge, offices, and an exclusive elevator located at the "Apron Level;" and 3) another optional storage space including a loading dock and trash bin located at the "Basement Level." Id. at GIAAPR 100015, GIAAPR 100036. Also attached to the Procurement was a map that highlighted those areas within the Main Passenger Terminal that were covered by the Procurement. See Weiss Decl., Ex. 1.

The Procurement also identified the following Evaluation Criteria: 1) Facility Design and Capital Investment; 2) Concepts and Theme and Merchandise and Marketing Plan; 3) Experience, Qualifications, and Financial Capability; 4) Management and Operations Plan; and 5) Annual Rent and Projected Sales. Rapadas Decl., Ex. 23 at GIAAPR 100040-41.

Finally, the Procurement also included an "Other Information" category that permitted proposers to submit "any other information that it believes would be helpful in evaluating its proposal and the Proposer's ability to successfully develop and operate the concession." Id. at GIAAPR 100049.

Upon careful review of the Procurement issued by AIAA, it is clear that the designated areas for the specialty retail space were specifically defined within the Main Passenger Terminal. The Procurement itself made multiple references to the Main Concession Space. Nowhere in the Procurement provisions, nor the map attached, did it provide or illustrate spaces outside the Main Passenger Terminal or highlight areas within the Main Passenger Terminal unrelated to the retail space. In addition, the map clearly illustrated the space for the specialty retail concession, including the main retail space and additional spaces for the operation of the retail concession, nothing else. Also, upon review of the Evaluation Criteria, when read together, clearly refers to the operation of the concession within the designated spaces of the Main Passenger Terminal defined in the Procurement. The Evaluation Criteria did not, as AIAA contends, allow proposers to consider a broad range of issues associated with the five criteria.

Although the purpose of the Procurement was to "expand" the existing retail concession program, the Procurement clearly stated its objective was "to develop, construct, and operate a high quality *specialty retail concession at the GIAA Main Passenger Terminal.*" Id. at GIAAPR 10012 (emphasis added). Further, proposers were permitted to submit offers for "Additional Space" however, the Procurement clearly sought proposals for additional locations *within the Main Terminal Building* for the *operation of the concession.* Id. at GIAAPR 100036 (emphasis added).

What is unclear is a vague reference to include "Other Information" in a category placed at the end of the Procurement packet. Although nothing in the Procurement expressly stated that

proposers could include additional offers outside and unrelated to the retail space, nor did the Procurement expressly prohibit additional benefits, this "Other Information" section allowed proposers to submit any other information it believed would help in the evaluation of its proposal, as well as that proposer's ability to successfully develop and operate the concession. Id. at GIAAPR 100049. It is within this section that AIAA argues that the Procurement contained a "broad catchall." Mot. at 12. According to AIAA's interpretation, this provision allowed proposers to include offers outside and unrelated to the Main Concession Space that would improve the retail concession as a whole. However, at least one proposer, namely DFS, interpreted this section to mean the opposite. In its proposal, DFS did not include any offers outside or unrelated to the retail concession defined in the Procurement. Therefore, DFS understood the scope of the Procurement to include only the operation of the retail concession within the defined spaces of the Main Passenger Terminal. Opp'n. at 15.

The Court is unable to determine with certainty, just by looking at the language of the "Other Information" provision and within the Procurement packet itself, what the drafter's of the Procurement meant by "any other information." See Banknote, 365 F.3d at 1353; see also Id. at GIAAPR 100049. The fact that one proposer understood the provision to allow for additional benefits outside and unrelated to the retail concession, i.e. a "broad catchall," and another proposer did not, demonstrates that the provision was open to more than one interpretation. See id. Therefore, the Court finds this provision of the Procurement to be vague and ambiguous. As with a contract, a court must look to extrinsic evidence to interpret the ambiguity. See id ("[i]f the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them."); see also Bank of Guam v. Flores, 2004 Guam 25 ("[i]t is a well-settled principle that if a contract is ambiguous on its face, a court must look to extrinsic evidence to interpret the contract.") (citations omitted). Because extrinsic evidence is warranted, a material issue of fact exists as to the interpretation of the "Other Information" provision of the Procurement and therefore, the Court is precluded from granting summary judgment on that basis.

Regardless of whether or not the "Other Information" provision allowed for "additional benefits," an open-ended provision contained in the Procurement would violate Guam's Procurement Law, which states that one of the "underlying purposes and policies" is "to ensure the fair and equitable treatment of all persons who deal with the procurement system of this Territory." 5 GCA § 5001(b)(4). Similarly, if the Court were to accept AIAA's argument that the agency had broad discretion to consider offers not expressly requested by the Procurement, then any proposer, after meeting the minimum requirements, could offer all but the kitchen sink in order to make its proposal more attractive. This position not only encourages inequity in the Procurement solicitation process, it is contrary to the Procurement Law. Id. Thus, the Court DENIES AIAA's Motion for Summary Judgment as to those Causes of Action in Complaint No. 2 insofar as they are based on DFS' allegations of improper "additional benefits" offered by Lotte and considered by AIAA.

### III. DFS' Second Protest Regarding "Additional Benefits" was Timely as a Matter of Law.

Guam's Procurement Law requires that a procurement protest "shall be submitted in writing within fourteen (14) days after such aggrieved person knows or should know of the facts giving rise thereto." 5 GCA § 5425(a). Consequently, any protest filed after the fourteen (14) day period will not be considered. See 2 GAR, Div. 4 § 9101(c)(1). Further, the Procurement Law allows "[a]ny actual or prospective bidder, offeror, or contractor who may be aggrieved in connection with the method of source selection, solicitation or award of a contract" to file such protest. 5 GCA § 5425(a).

In addition to AIAA's argument that "additional benefits" were permitted by the Procurement and the Procurement Law, AIAA argues that it is entitled to summary judgment on all of DFS' claims based on those allegations because DFS' Second Protest asserting those claims was untimely. Specifically, AIAA argues that DFS indisputably new of the material facts forming the bases for its protest more than fourteen (14) days before it submitted its Second Protest on May 29, 2013, and then supplemented that protest on June 7, 2013. Therefore, AIAA argues that DFS failed to comply with the statutory time period set forth in 5 GCA § 5425(a).

Thus, AIAA maintains that because DFS' protest regarding "additional benefits" was untimely, the Court does not have subject matter jurisdiction to hear those claims.

AIAA contends that DFS had confirmation of all the material facts to form the bases of its Second Protest no later than August 24, 2012, when DFS employee, Jim Beighley, wrote to other DFS officers regarding AIAA's consideration of proposals that included offers to improve and develop areas outside or unrelated to the Main Concession Space. Mot. at 16; Rapadas Decl., Ex. 19. In addition, AIAA argues that by September 5, 2012, DFS was aware that Lotte was going to include an offer of a downtown store in its proposal, and that by February 1, 2013, DFS had known that Lotte offered to make renovations to parts of the airport outside of the retail concession space. Mot. at 16; Rapadas Decl., Ex. 45, 46.

DFS, on the other hand, counters that it did not know of the facts regarding what Lotte actually offered in its proposal or what AIAA actually considered until May 20, 2013, when AIAA management publicly announced its purported May 18, 2012 concession agreement with Lotte. In addition, DFS argues that it learned of Lotte's offer of "additional benefits" when it obtained Lotte's proposal and presentation material from AIAA on June 3, 2013, in response to DFS' Sunshine Act Requests. Opp'n. at 18; Weiss Decl., Ex. 27 at GIAAPR 700324. Based on that information, DFS maintains that it timely supplemented its Second Protest on June 7, 2013, making its Second Protest well within the fourteen-day deadline mandated by 5 GCA § 5425(a).

As discussed above, DFS filed its Second Protest during the pendency of the First Protest and during the pre-award phase of the Procurement. See Section I, supra. Therefore, the automatic stay also affected the fourteen-day filing deadline for the Second Protest. An automatic stay pursuant to statute tolls statutes of limitations. See Pac. Rock Corp. v. Dep't of Educ., 2001 Guam 21 ¶ 53 (the statute of limitations is tolled by the prerequisite of exhausting administrative remedies under the Procurement statutes); Bishop v. Apfel, 91 F.Supp.2d 893, 894 (W.D. Va., 2000) (the time limit for seeking judicial review of an administrative decision is subject to equitable tolling); see also Urban Renewal Auth. v. Dongbu Ins. Co., 2001 Gaum 24 at ¶¶ 10-14 (adopting the equitable tolling doctrine). In the Court's Decision and Order on AIAA's Motion for Summary Judgment No. 1 (First Protest), the Court found that DFS became

aggrieved, pursuant to 5 GCA § 5425(a), on April 16, 2013. Again, the Court adopts these findings and applies the same principles to the Second Protest.

DFS became aggrieved on Tuesday, April 16, 2013, when AIAA officially notified the proposers that Lotte was the most qualified proposer and therefore, had until April 30, 2013, to file a protest. However, DFS' time to file its Second Protest was tolled by the activation of the First Protest's automatic stay. Because the 2012 Procurement remains stayed to this date, the Court finds that DFS timely filed its Second Protest. Thus, the Court DENIES AIAA's Motion for Summary Judgment as to those Causes of Action in Complaint No. 2 insofar as they are based on DFS' allegations of improper "additional benefits" offered by Lotte and considered by AIAA.

### IV. A Material Issue of Fact Exists as to Whether Lotte Modified its Original Proposal Past the Proposal Due Date in Violation of the Express Terms of the Procurement.

Guam Law states that "[p]roposals may be modified or withdrawn at any time prior to the conclusion of discussions." 2 GAR, Div. 4 § 3114(i)(3). However, the Procurement itself sets forth a prohibition against modification of proposals, which expressly stated that "[p]roposals may be modified or withdrawn at any time *prior to the Proposal Due Date.*" Rapadas Decl., Ex. 23 at GIAAPR 100012, GIAAPR 100028 (emphasis added). Therefore the Procurement clearly required the proposers to make their offers and any modifications by October 17, 2012, in order to be considered by AIAA. Ada Decl. (MSJ 2), ¶ 4.

AIAA argues that it is entitled to summary judgment as to DFS' Sixth (6th) and Seventh (7th) Causes of Action based exclusively on allegations that Lotte made untimely modifications to its original proposal, as well as DFS' Eight (8th) and Ninth (9th) Causes of Action based in part on those allegations. Specifically, AIAA argues that Lotte never modified its written proposal with regard to the MAG Rent and Percentage Rent Rate, the Downtown Duty Free Store, and the potential Third Floor at the Airport. In addition, AIAA maintains that any alleged modifications were never considered by the evaluators and, in the alternative, argues that the Procurement does not mandate automatic disqualification for untimely modifications. DFS, on the other hand, argues that Lotte modified its financial offer during its November 29, 2012,

Presentation by: 1) increasing its MAG Rent from $13 million to $15.4 million and its Percentage Rent Rate from 30.1% to 33% for the Main Concession Space; 2) increasing its proposed capital expenditure from $36 million to $55 million; 3) offering to pay AIAA a marketing fee from its Downtown Duty Free Store revenues, and 4) offering to invest $32 million toward the construction of a Third Floor at the Airport.

Summary judgment on an issue should be granted when no material facts are in dispute and the moving party is entitled to judgment as a matter of law. Iizuka Corp. v. Kawasho Int'l (Guam), Inc., 1997 Guam 10 ¶ 7. A genuine issue exists when there is "sufficient evidence" establishing a factual dispute requiring resolution by a fact-finder. Id. ¶ 8 (citing T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)). The factual dispute must concern a "material fact." Id. Whether a fact is material is determined by the governing substantive law; if the fact may affect the outcome, it is material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Here, with regard to the MAG Rent and Percentage Rent Rate for the Main Concession Space, it is undisputed that Lotte's original proposal included a MAG Rent of $13 million and a Percentage Rent Rate of 30.1 %, plus a MAG Rent of $240,000 and a Percentage Rent Rate of 25.0% for the Additional Space. Ada Decl. (MSJ 2), Ex. 24 at 13, 389. It is also undisputed that Lotte's original proposal included offers regarding a potential Downtown Duty Free Store and the construction of an additional floor at the Airport. Id. at 405, 406. The facts before the Court also show that during Lotte's November 29, 2012 interview with AIAA, Lotte included in its presentation materials a proposed MAG Rent for the Main Concession Space at $15.4 million with a Percentage Rent Rate of 33.0%, while its proposed MAG Rent and Percentage Rent Rate for the Additional Space remained the same. Rapadas Decl. Ex. 27, at GIAAPR 103798.

AIAA maintains that the $15.4 million figure was not the MAG Rent offer for the Main Concession Space, but instead was an illustration for the 10-year concession period that included potential income from the Downtown Duty Free Store and the Third Floor, which AIAA argues were both identified in Lotte's original proposal. Mot. at 17. However, the evidence before the Court also shows that Lotte described the $15.4 million figure as the "MAG

Rent" for the "Main Concession" in its November 29, 2012 presentation materials. Id. Further, these figures identified in the "Conclusion" section of Lotte's presentation materials were labeled as "The Updated Concession Revenue Picture" and "Average over 10-year concession – UPDATED FROM INITIAL SUBMISSION." Rapada Decl. Ex. 27, at GIAAPR 103798. The evidence submitted by DFS also shows that one of the evaluators, Pedro Roy Martinez, stated in an oral deposition that he based his evaluation of Lotte's proposal using the $13 million MAG Rent figure. Weiss Decl. Ex. 2, at 169. However, this evidence is contradicted by the fact that Mr. Martinez, in the "Comments" section of his Evaluation Score Sheet of Lotte, although indicated a MAG Rent of $13 million plus $240,000 for the Additional Space, also included next to the "Facility Design and Capital Investment" criteria, an additional MAG of $2 million for the Downtown Duty Free Store. Rapadas Decl. Ex. 37, at GIAAPR 103884-85. Thus, evaluating Lotte's total MAG Rent at approximately $15 million. Id. Further, Mr. Martinez, in his notes regarding Lotte's November 29, 2012 interview, indicated a MAG Rent of $15.4 million and a Percentage Rate Rent of 33%. Id. at GIAAPR 103891-45.

In viewing the evidence in light most favorable to DFS, the evidence that Lotte included in its presentation materials that the MAG Rent and Percentage Rent Rate for the "Main Concession" was $15.4 million and 33.0%, as well as concluding during its interview that the figures were "updated from initial submission," presents a genuine issue of material fact, relative to whether Lotte untimely modified its proposal. In addition, the evidence of Mr. Martinez's evaluation notes indicating an additional MAG Rent of $2 million for the Downtown Duty Free Store and presentation notes indicating Lotte's MAG Rent of $15.4 million and Percentage Rent Rate of 33.0% also presents a genuine issue of material fact, relative to whether AIAA considered any alleged modifications in evaluating Lotte's proposal. Further, it is unclear to the Court how the Percentage Rent Rate increased from 30.1% to 33%, and neither party presented evidence explaining this distinction. Thus, because a genuine issue of material fact exists as to whether Lotte modified its original proposal past the proposal due date and in violation of the express terms of the procurement, the Court DENIES AIAA's Motion for

Summary Judgment as to those Causes of Action in Complaint No. 2 insofar as they are based on DFS' allegations that Lotte modified its original proposal past the submission deadline.

## CONCLUSION

For the reasons set forth above, because the Court finds that DFS filed its Second Protest during the pre-award phase of the Procurement, the Court DENIES AIAA's Motion for Summary Judgment as to those Causes of Action in Complaint No. 2 insofar as they are based on DFS' automatic stay claims regarding DFS' Second Protest.

For the reasons set forth above, because a material issue of fact exists as to whether those "additional benefits" included in Lotte's proposal were permitted by the Procurement, the Court DENIES AIAA's Motion for Summary Judgment as to those Causes of Action in Complaint No. 2 insofar as they are based on DFS' allegations of improper "additional benefits" offered by Lotte and considered by AIAA.

For the reasons set forth above, because the 2012 Procurement remains stayed to this date, the Court finds that DFS timely filed its Second Protest. Thus, the Court DENIES AIAA's Motion for Summary Judgment as to those Causes of Action in Complaint No. 2 insofar as they are based on DFS' allegations of improper "additional benefits" offered by Lotte and considered by AIAA.

For the reasons set forth above, because a genuine issue of material fact exists as to whether Lotte modified its original proposal past the proposal due date and in violation of the express terms of the procurement, the Court DENIES AIAA's Motion for Summary Judgment as to those Causes of Action in Complaint No. 2 insofar as they are based on DFS' allegations that Lotte modified its original proposal past the submission deadline.

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

IT IS SO ORDERED this _____ FEB 0 2 2018 _____.


HONORABLE ARTHUR R. BARCINAS

Judge, Superior Court of Guam

SERVICE VIA COURT BOX
I acknowledge that a copy of the original hereto was placed in the court box of:
Civille, BSJM
CKT, Cabot
Date 2/2/18 Time: 1 PM
Jerimie K.C. James
Deputy Clerk, Superior Court of Guam